UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

SECURITIES AND EXCHANGE    :
COMMISSION,                :
          Plaintiff,    :
                    :
       v.           :      CA 10-433 M
                    :
ONLINE-REGISTRIES, INC.,    :
and DAVID G. STERN,       :
          Defendants,   :
                    :
       and          :
                    :
MICHELE RITTER,          :
          Relief Defendant. :

**REPORT AND RECOMMENDATION**

David L. Martin, United States Magistrate Judge

Before the Court is Plaintiff's Motion for Issuance of Order of Civil Contempt against Defendant David G. Stern (Docket ("Dkt.") #36) ("Motion for Contempt" or "Motion") filed by Plaintiff Securities and Exchange Commission (the "Commission" or "Plaintiff"). The Motion has been referred to me pursuant to 28 U.S.C. § 636(b)(1)(B) for preliminary review, findings, and recommended disposition. After reviewing the filings and listening to oral argument, I recommend that the Motion be denied.

## I.  Facts and Travel

The Commission commenced this action against Defendants Online-Registries, Inc. d/b/a Online Medical Registries ("OMR"), and David G. Stern ("Stern") (collectively "Defendants") and Relief Defendant Michele Ritter ("Ritter") on October 19, 2010. The

following day a temporary restraining order was entered against Defendants. See Temporary Restraining Order, Order Freezing Assets and Order for Other Equitable Relief (Dkt. #2) ("TRO"). Stern moved on October 25, 2010, to have the TRO dissolved. See Motion to Dissolve Temporary Restraining Order (Dkt. #3).

On October 26, 2010, District Judge William E. Smith conducted a courtroom conference with the parties. See Dkt. During the conference Judge Smith indicated that he "would order a carve-out from the asset freeze contained in paragraphs III and IV [of the TRO] to provide Mr. Stern with funds to meet his basic needs for approximately the next two months." Letter from Gametchu to Smith, J., of 10/29/10 ("Gametchu Letter") at 1; see also Letter from Stern to Smith, J., of 10/21/10[1] ("Stern Letter") at 1 ("[T]he Court, I thought, told the parties to agree on language that removed from the asset freeze sufficient sums to allow for the operation of the OMR, allow me to pay my bills and exclude altogether Neptune Press and Golf a la Carte."). Following the conference, however, the parties were unable to agree on the wording of the order for the "carve-out" which Judge Smith had referenced.

Judge Smith referred the matter to this Magistrate Judge with

---

[1] Although the letter from David G. Stern ("Stern") to Judge Smith bears the date "October 21, 2010," Letter from Stern to Smith, J., of 10/21/10 at 1, Stern stated at the November 5, 2010, mediation with this Magistrate Judge that this was a typographical error and that the correct date of the letter was October 29, 2010. This seems likely as the letter was received on November 1, 2010.

instructions to conduct a mediation regarding the wording of the order. The mediation was held on November 5, 2010, but it was unsuccessful. See Report and Recommendation of 11/8/10 (Dkt. #9) ("R&R of 11/8/10") at 1. This Magistrate Judge then informed the parties that he would issue a report and recommendation as to how the differences over the wording of the order should be resolved. See id. The report and recommendation was issued on November 8, 2010, and accepted by Judge Smith on December 8, 2010, with clarifications which included:

> 2. Stern may not obtain funds by soliciting or accepting further investments in Online-Registries, Inc.;
>
> 3. Stern's personal bank account at Newport Federal Savings Bank is not subject to the asset freeze so that he may access his monthly social security benefit, as discussed in the Report and Recommendation.

Order (Dkt. #14) ("Order of 12/8/10")[2] at 1.

On February 24, 2011, a Stipulated[3] Preliminary Injunction Order Freezing Assets, and Order for Other Equitable Relief (Dkt. #23) was entered by Judge Smith. A second Stipulated[] Preliminary Injunction, Order Freezing Assets, and Order for Other Equitable Relief (Dkt. #24) was signed by Judge Smith on March 4, 2011. The only apparent difference between the two orders was the addition of

---

[2] The Order of 12/8/10 was entered by Judge Smith on that date and docketed the following day.

[3] The Stipulated Preliminary Injunction was agreed to by Stern and Plaintiff Securities and Exchange Commission (the "Commission" or "Plaintiff"). Defendant Online-Registries, Inc., had not yet appeared before the Court. See Stipulated[] Preliminary Injunction, Order Freezing Assets, and Order for Other Equitable Relief (Dkt. #23) at 1 n.1.

a ten word introductory phrase at the beginning of ¶ 3.(III)(b).

The Commission filed the instant Motion for Contempt on August 3, 2011, alleging that Stern had violated the Preliminary Injunction ("PI") and preceding TRO, as modified by the Order of 12/8/10 and the R&R of 11/8/10. See Motion at 1. Stern responded on August 15, 2011, with an opposition to the Motion. See Defendant David G. Stern's Memorandum in Opposition to Plaintiff's Motion for Contempt (Dkt. #37) ("Stern's Opposition"). The Commission filed a reply brief on August 22, 2011. See Plaintiff's Reply Brief in Support of Motion for Issuance of Order of Civil Contempt against Defendant David G. Stern (Dkt. #38) ("Plaintiff's Reply Mem.").

A hearing on the Motion was held on September 9, 2011. Because the Commission offered in evidence several documents at the hearing of which Stern did not have prior notice, the Court gave him until September 23, 2011, to file a reply memorandum addressing these exhibits. On September 12, 2011, the Commission requested leave to submit three additional documents in support of the Motion for Contempt. See Letter from Gametchu to Martin, M.J., of 9/12/11 (Dkt. #44) at 1. Stern objected to this request, see Defendant David G. Stern's Memorandum in Opposition to Plaintiff's Request for Leave to File Additional Evidence (Dkt. #46) ("Stern's Mem."), and asked for an additional week to file his reply memorandum if the Court were inclined to allow the Commission to

4

file the additional documents, <u>see</u> Letter from Stern to Martin, M.J., of 9/13/11 (Dkt. #45). The Court treated Stern's response as an objection to the Commission's request for leave. <u>See</u> Order Extending Time for Filing of Post-Hearing Memoranda (Dkt. #47) ("Order of 9/21/11") at 1. Because the Court concluded that it would allow the three additional documents, the Court granted Stern's request for an extension of time to file his post-hearing memorandum. <u>See</u> <u>id.</u> He was given until September 30, 2011, to do so. <u>See</u> <u>id.</u> However, Stern filed an Affidavit (Dkt. #51) on September 26, 2011, but he did not file the memorandum until October 4, 2011, <u>see</u> Defendant David G. Stern's Supplemental Memorandum in Opposition to Plaintiff's Motion for Contempt (Dkt. #53) ("Stern's Supp. Mem.").

## II. Discussion

### A. Grounds for Motion

The Commission alleges that Stern has violated paragraphs III(a), V, and X of the Preliminary Injunction ("PI").[4] <u>See</u> Plaintiff's Memorandum of Law in Support of Motion for Issuance of Order of Civil Contempt against Defendant David G. Stern ("Plaintiff's Mem.") at 2. To the extent that the conduct by Stern about which the Commission complains may predate the entry of the PI, the Commission contends that his actions violated provisions of

---

[4] To be precise, the complete designations of the paragraphs are: 3.(III)(a); 3.(V); and 3.(X). <u>See</u> PI at 2, 4, 6, 7. However, for simplicity, the Court identifies the paragraphs as the Commission does.

the TRO, specifically paragraphs "III.A.; VIII.; and III.A., III.B. and IV., as modified by the Court's December 8, 2010 Order and pages 10-11 of the Report and Recommendation ... dated November 8, 2010." Id. at 2 n.1. The Court discusses each of the paragraphs of the PI (and corresponding provisions of the TRO) which the Commission contends Stern has violated.

### 1. Paragraph III(a) of the PI

Paragraph III(a) of the PI prohibits Stern from, among other things, transferring, dissipating, or causing a diminution in value of any asset of OMR. See PI ¶ III(a).[5] The Commission alleges that in or around January 2011 Stern created a competing business, Instant Access LLC d/b/a Instant Medical Access ("IMA"), see Plaintiff's Mem. at 2-4, and that such action "further victimizes OMR's investors ...," id. at 4. In the Commission's view, Stern hired Michael Tracey Zellman ("Zellman"),[6] a friend who writes computer programs, see Deposition of Michael T. Zellman ("Zellman Dep.") at 14, 27, "to re-package the OMR technology under the IMA name," Plaintiff's Mem. at 3 (citing Zellman Dep. at 120-121; 128-129). According to the Commission:

In essence, Stern asked Zellman to use and slightly alter

---

[5] The corresponding provision of the TRO is Section III.A. See TRO at 3-4.

[6] Stern spells Zellman's name as "Zellmann." Stern's Opposition at 4. The Court spells Zellman's name as it appears on the cover of his deposition, but notes that he was not asked to spell his name at the commencement of the deposition. See Deposition of Michael T. Zellman ("Zellman Dep.") at 4.

the existing source code that Zellman had previously created for OMR for the benefit of IMA, a new and wholly unrelated entity. Zellman testified that while certain alterations he made (or would make) to the source code simply identified IMA rather than OMR, *see* [Zellman Dep. at 120-121], the OMR and IMA applications would be virtually identical and use the same technology. *See* Zellman Dep[]. at 128-129.

Plaintiff's Mem. at 3.

Stern disputes that any "asset" of OMR was used in the creation of IMA. Stern's Opposition at 4.[7] According to Stern, he hired Zellman,

whom he had hired several years before to work with OMR, to create a "phantom" site, which contained only static content, no proprietary technology was used and no application existed. The site would be used only for design feedback and was not publically viewable [Zellman Dep. at 102-103, 121-122]. Anyone could have cut and pasted OMR's static content (all of which Defendant Stern wrote) onto another site.

Id.

The Court has read Zellman's entire deposition. While it appears that the work he performed for IMA drew (or built) upon work he had previously performed for OMR and that his responses to some questions support the Commission's interpretation of his testimony,[8] the Court is not entirely comfortable making a finding

---

[7] The pages of Stern's memorandum are not numbered. His attention is directed to District of Rhode Island Local Rule ("DRI LR") Cv 5(a)(3) which provides in relevant part: "Where a document is more than one page in length, the pages shall be numbered at the bottom center of each page." DRI LR Cv 5(a)(3).

[8] The Commission relies especially on the following exchange:

Q. And so was the content -- the OMR content on the website basically the same as the IMA content

7

that Stern's actions relative to IMA have diminished the value of
any asset of OMR. There are three reasons for the Court's
disquietude. First, although the portions of Zellman's testimony
cited by the Commission seem clear when read in isolation, they are
less so when other portions of his jargon-laced testimony are
considered. For example, Zellman testified that "there isn't an
application out there called Instant Medical Access,"[9] Zellman Dep.
at 102, but he appeared to indicate that there is an OMR

---

                    except that you had just taken out OMR references?

          A.    No.  I mean, it was -- it wasn't identical, all
                right.  I mean, there were -- if you read the two
                of them, you would see a lot of similarities.  I
                think there were changes and there was some
                rearrangement, but it was -- it wasn't substantial.

          Q.    The changes were not substantial and substantively
                would you say they were virtually identical?

          A.    I would say they were.

Zellman Dep. at 128-129.

     [9] This statement was made during the following exchange:

          Q.    And the IMA web application that would provide
                this service using a different authentication
                protocol, is --

          A.    Right.

          Q.    -- is that web application your web application,
                the one you created for OMR?

          A.    Well, there's a couple things.  The instant –
                there isn't and hasn't been -- there isn't
                an application out there called Instant Medical
                Access ....

Zellman Dep. at 102.

application, see id. at 42, 49, 53, 61, and also an "Online-Registries application," id. at 61.[10]  He also testified that he performed some IMA work for his own purposes which suggests that it was not done at Stern's direction.  See id. at 122 (responding to a question as to when he last performed work with respect to IMA: "Well, let's see, I performed work on the IMA application, I would say on my own behalf, not to make it a public application, but just to perfect the Ruby on Rails internal stuff perhaps two weeks ago, but anything that was visible to the outside, the date that I received the subpoena."); see also id. at 122-123 ("There were a number of implementation issues that, to me, I was still learning from and that was worthwhile.  And then when it was this whole thing about moving the Instant Medical Access incarnation into this rails three, thin controllers, fat models rather than fat controllers and thin models and internally more tests included in the application itself, to me that was -- that was very important and interesting thing to do.").

In addition, Zellman indicated that he did not always clearly

---

[10] This is reflected in the following response:

> Q.   Did he ever mention to you that OMR had obtained customers as a result of that testing?
>
> A.   No.  So, I mean, I don't want to be too technical about this but that was the Online-Registries application. That was the one that was in existence before I started to get involved.  It was not the Online Medical Registries Application.

Id. at 61.

distinguish between the work he performed for OMR and the work performed for IMA:

> Q.    Okay.  And so can you direct my attention to the entries that represent money for Instant Access work?
>
> A.    Well, I will answer the question, and I don't want to make it muddy, but there isn't a complete distinction in my mind. ...

Id. at 97.

> Q.    And is that thousand dollar payment there, is that an additional payment?
>
> A.    No.
>
> Q.    It's the same one?
>
> A.    It was -- I mean, there's a certain artificiality about which thousand dollars gets applied to OMR and which gets applied to IMA.

Id. at 111.

> Q.    Okay.
>
> A.    Okay.  So the May 19 -- by May 19, I had received another thousand dollars, right, I arbitrarily chose to apply the March 14 thousand dollars to what I had been owed for OMR work and apply the new thousand dollars to the IMA work. ...

Id. at 112.

Second, the Commission overstates some matters, and this gives the Court pause in embracing the Commission's assessment of the harm allegedly caused to OMR as a result of Stern's creation of IMA.  For example, the Commission asserts that all payments by Stern to Zellman "other than those made for services provided prior to November 5, 2010, constitute blatant violations of Section X of

the Preliminary Injunction." Plaintiff's Mem. at 6. However, as explained in Section 3, _infra_, the Court is unable to agree that such payments violate the PI.

The Commission's characterization of Zellman's testimony also seems somewhat overstated. The Commission alleges that Stern "lured Zellman to the IMA venture by telling him that the OMR product needed a new name and fresh start because it had run its course in the marketplace." Plaintiff's Mem. at 3. However, Zellman testified unequivocally that Stern never asked him to invest money in OMR or IMA, _see_ Zellman Dep. at 58, 116, and Zellman appears to have had a healthy skepticism of the business models for both OMR and IMA, _see_ _id._ at 58, 104-105, 116 ("I just wanted to be an independent contractor.").[11] It does not appear that he agreed to perform work for IMA because he believed it had great potential for being profitable.

Third, the Commission previously appeared to take the position that OMR's technology had little or no value. _See_ Complaint (Dkt.

---

[11] In describing how he viewed his relationship with Stern as of 2007, Zellman testified:

> I'm not going to -- I'm not going to entrust him with any of my money and, in fact, I'm going to be careful that sort of he can't have the whole application without, you know, paying me. So that was sort of -- that was the basis that I could see as a way to go forward.

Zellman Dep. at 32; _see also_ _id._ at 115 ("Well, first of all, I wasn't going to do anything about it until I got paid, and I was completely unclear from this where or when I would get paid.").

#1) ¶ 1 (describing OMR as a company that "purports to offer a web-based service that allows its subscribers to store, organize, and disseminate to authorized recipients, their confidential medical information"); id. (alleging that Stern's misrepresentations related to, among other things, "the status of the technology supporting the product that OMR sells"); ¶ 12 (including — beneath heading of fraudulent solicitation of investments in OMR — allegation that "Stern told potential investors that OMR had developed a technology that would revolutionize the dissemination of medical information in emergencies and at other critical times"); ¶ 14 (alleging that in 2005 Stern falsely "told an investor ... that OMR had successfully beta tested its technology"); ¶ 16 (asserting that the agreement OMR signed with Google Health in April 2010 that permitted OMR to develop an interface with Google Health's databases did not have the significance and value which Stern ascribed to it).

Now, however, the Commission seems to have changed its tune, at least somewhat, relative to the value of OMR's technology. The change appears to be prompted (or influenced) to some degree by the Commission's discovery that Stern has been engaging in investment activity which the Commission believes is prohibited by the PI and/or TRO. Whether such conduct is in fact clearly prohibited by those orders is addressed in the next section. However, given the Commission's previous jaundiced view of the value of OMR's

technology, the Court has some hesitancy in now finding that Stern has diminished the value of OMR by utilizing some of that technology relative to IMA.

The Court's misgivings are reinforced by the fact that when Stern wanted to be permitted to expend funds in November 2010 to keep OMR operational and, in his view, "save," R&R of 11/8/10 at 5 (quoting Email from Stern to Shields of 10/28/10), the business, the Commission was adamant in its opposition, see id. at 7 ("Permitting Mr. Stern to dissipate the very limited funds and other assets that have been frozen in order to continue the operation of a business whose investments were likely obtained by fraud does not serve investors or the public interest.")(quoting Letter from Gametchu to Smith, J., of 10/29/10 at 1). To be blunt, the Commission seems far more concerned now about the value of OMR's technology and business than it did in November of 2010 when it was opposed to the expenditure of any funds to preserve the business of OMR, including its technology.[12] It appears that the change is not altogether unrelated to the Commission's desire to have Stern adjudged in contempt.

---

[12] The Commission may be of the mind that no expenditure of funds was necessary to preserve OMR's technology and, therefore, its present position with respect to the value of such technology is not inconsistent. The Court does not share this view. If a business is shut down abruptly and no further expenditures of any type are permitted, it is likely that some assets which could have been preserved through an orderly shutdown may be harmed or lost. In the case of OMR, Zellman was owed money for the technology, and the failure to allow payment of his bills could have jeopardized the preservation of that work.

For these reasons, the Court declines to find that the Commission has demonstrated that Stern has violated paragraph III(a) of the PI.

### 2. **Paragraph V of the PI**

The Commission contends that Stern has violated paragraph V of the PI by soliciting, accepting, or depositing monies from actual or prospective investors of IMA. <u>See</u> Plaintiff's Mem. at 4-5; <u>see also</u> Transcript of 9/9/11 Hearing ("H. Tr.") at 44 (arguing that "to the extent [Stern] thinks he's entitled to be out there raising money from investors and new ventures[,] he's just mistaken. He's prohibited from doing that."). Paragraph V states that:

> Stern and OMR and each of their agents, servants, employees and attorneys and those persons in active concert or participation with them who receive actual notice of this Order by personal service or otherwise, including via facsimile or email transmission or overnight delivery service, are hereby prohibited from soliciting, accepting, or depositing any monies obtained from actual or prospective investors, **in OMR or otherwise**, pending the resolution of this action.

PI at 6 (bold added).

This wording is identical to wording of Section VIII of the TRO except for "in OMR or otherwise." These four words do not appear in the TRO. <u>Compare</u> PI at 6 <u>with</u> TRO at 7-8. Thus, the TRO, as originally entered, prohibited Stern from soliciting or accepting money from investors for <u>any</u> purpose. However, the TRO was modified by Judge Smith's Order of 12/8/10, and one of the modifications made was that "Stern may not obtain funds by

14

soliciting or accepting further investments in Online-Registries, Inc[.]" Order of 12/8/10 at 1. As Stern was already barred from soliciting or accepting further investments in Online-Registries, Inc., by the broad prohibition contained in the TRO as originally entered, Judge Smith's modification is reasonably understood as reducing the scope of the prohibition to the solicitation or acceptance of investments for "On-Line Registries."

The Commission presumably contends that the insertion of the words "in OMR or otherwise," PI at 6, effectively reinstated the prohibition against _any_ solicitation or acceptance of investments by Stern and that, therefore, any solicitation or acceptance of funds by him for IMA violates paragraph V. However, the first sentence of paragraph 3 (of which paragraph V is actually a subparagraph) states that the substantive terms of the PI "do not materially vary from those set forth in the [TRO] ... as modified by the Court's December 8, 2010 Order ...." PI at 2 (bold and italics omitted). This weighs against the interpretation which the Commission seeks to place on the words "in OMR or otherwise." The reinstatement of a broad prohibition against _any_ solicitation or acceptance of investments by Stern would clearly be a material variance from the terms of the TRO as modified by the Order of 12/8/10. Thus, the interpretation of subparagraph V which the Commission espouses is in conflict with the qualifying language at the beginning of paragraph 3.

At the very least, the qualifying language at the beginning of paragraph 3 creates additional uncertainty as to the meaning of the words "in OMR or otherwise." Therefore, the Court is not persuaded that Stern's solicitation or acceptance of funds from investors for IMA constitutes a clear violation of paragraph V of the PI.

### 3. Paragraph X of the PI

The Commission asserts that all payments to Zellman "other than those made for services provided prior to November 5, 2010, constitute blatant violations of Section X of the Preliminary Injunction." Plaintiff's Mem. at 6. However, Section X allows Stern to pay "OMR's basic ongoing operating expenses, such as rent and utility expenses, paid to third parties ...." PI at 7; see also id. at 2 n.2 ("Section 3(X)(c) permits payment of certain ongoing expenses of OMR ...."). While the payment of basic operating expenses as authorized by Section X is subject to the additional conditions stated in that Section, there is no explicit prohibition against Stern using his social security benefit to pay such expenses.[13] Thus, the Court is unable to agree with the Commission that the payments made to Zellman for services provided to OMR after November 5, 2010, constitute a violation of paragraph X of the PI.

---

[13] This is true even though the basis for this Magistrate Judge's recommendation that Stern's monthly social security benefit be excluded from the TRO was that he be able "to provide himself with the bare necessities of life ...." R&R of 11/8/10 at 9.

The Court is also reluctant to find a violation of paragraph X given that it contains an error in the qualifying phrase which begins the paragraph: "Other than access to his social security benefits in accordance with Section 4(IX) [sic] ...."  PI at 7. There is no Section "4(IX)" in the PI.  Although there is a Section "3(IX)," the section does not refer to Stern's social security benefits.  While Section 3(VIII) refers to Stern's "social security benefit," and may have been the intended reference, see id. at 6, it is difficult to deny that there is a marked difference between "4(IX)" and 3(VIII).

### 4.  The Commission's Post Hearing-Submissions

With respect to the three documents submitted by the Commission following the September 9, 2011, hearing, see Letter from Gametchu to Martin, M.J., of 9/12/11, the Commission states that two of the documents, Attachment ("Att.") A (Email from Stern to Eaton of 2/24/11) and Att. B (Vendor QuickReport), demonstrate that Stern was soliciting or accepting funds from James E. Eaton. However, the Court has already concluded that the PI does not clearly prohibit Stern from soliciting or accepting new funds from investors in IMA.  Stern also was not prohibited from obtaining loans to pay past due obligations of OMR.  See R&R of 11/8/10 at 11 n.5.  Accordingly, these two attachments do not advance the Commission's case relative to the Motion.

Att. C (Shareholder List) is, according to the Commission, a

list of OMR "investors that was provided to the Commission by Mr. Stern ... after the commencement of this litigation and was represented by Mr. Stern to be a then-current list of OMR's shareholders who invested after March 2005." Letter from Gametchu to Martin, M.J., of 9/12/11 at 2. At the September 9, 2011, hearing, Stern stated that Eaton had become a stockholder of OMR "back in the fall," H. Tr. at 56, but Eaton's name does not appear on the list, see Letter from Gametchu to Martin, M.J., of 9/12/11, Att. C. Stern also acknowledged at the hearing that the SEC had required him to disclose all the stockholders of OMR, see H. Tr. at 56. Thus, it appears that Stern's failure to include Eaton's name in the list of stockholders of OMR may have violated some requirement previously imposed on Stern.

The Court, however, is reluctant to make a finding of contempt based on this omission for three reasons. First, the Commission has not cited a particular provision of the TRO or PI which required Stern to submit a list of shareholders to the Commission, and the Court's review of those documents has not uncovered such a requirement. Second, the Court is disinclined to make a finding of contempt based solely on an issue which was not raised in either the Motion or Plaintiff's Reply Mem. and arose for the first time during the course of the hearing on the Motion. Third, Stern appears to indicate in his September 20, 2011, Affidavit (Dkt. #51) ("Stern's Aff.") that he provided a list of stockholders of OMR to

the Commission on or about August 23, 2011, Stern's Aff. ¶ 4, but cites unclearly to a copy of this list as being "attached to [the] Motion for Issuance of Contempt and marked 'B'," id. ¶ 5.  Assuming that "the Motion for Issuance of Contempt," id., is the instant Motion, the Court is unable to locate a document marked "B," id. The Court's usual procedure when it is unable to locate a cited reference is to raise the matter at the hearing on the motion at issue.  Here, however, the hearing has already been held.  Stern's Aff. suggests that he furnished the Commission with a list of OMR investors or stockholders that included Eaton's name.  The Court is reluctant to make a finding of contempt without Stern having had the opportunity to correct a citation regarding a matter that was not even part of the Motion prior to the hearing.

## III.  Summary

As the Court indicated at the hearing, it shares the Commission's surprise and concern that Stern has engaged in new investment activity involving a similar type of venture.  However, the Court is unpersuaded that the Commission has shown that Stern's conduct violates a clear order.  While Zellman's testimony supports to some degree the claim that Stern has utilized OMR technology for IMA, taken as a whole that testimony is not sufficiently compelling to support a finding that Stern's actions relative to IMA have caused a diminution in the value of OMR in violation of paragraph III(a) of the PI.  In addition, the Commission seems to have

changed its position regarding the value of OMR's technology, and this change appears not entirely unrelated to the Commission's desire to have the instant Motion granted.

With respect to Stern's alleged violation of paragraph V by soliciting or accepting investments in IMA, the Commission's interpretation of that paragraph overlooks the qualifying language of the first sentence of paragraph 3 of the PI. That sentence states that the substantive terms of the order do not materially vary from those set forth in the TRO, and the TRO, as modified by the Order of 12/8/10, only bars Stern from soliciting or accepting investments in Online-Registries, Inc.

Stern has not clearly violated paragraph X by making payments to Zellman for work relating to OMR and IMA. Paragraph X allows Stern to pay OMR's basic operating expenses provided the payments are made to third parties. In addition, the entire paragraph is rendered less than certain because of an error in the opening, qualifying phrase of the paragraph.

The Commission's post-hearing submissions do not persuade the Court that a different finding is mandated with respect to the Motion. As already explained, the TRO (as modified by the R&R of 11/8/10 and the Order of 12/8/10) and the PI do not clearly prohibit Stern from soliciting or accepting investments in IMA. They also do not prohibit him from obtaining loans from friends to pay OMR past due expenses. While Eaton's name does not appear on

the list of OMR stockholders which the Commission represents Stern provided, the Court is not inclined to base a finding of contempt on this ground which was not contained in the Motion and as to which Stern appears to claim he has a defense, even if imperfectly explained.

Lastly, if the Commission wishes to prohibit Stern from engaging in the kind of activity which prompted the instant Motion, the avenue available to the Commission is to seek a modification of the PI so that the conduct is explicitly prohibited and the order is unmistakably clear.[14]  In the absence of a clear order and clear violation, this Magistrate Judge is unable to recommend that Stern be adjudged in contempt.

## IV. Conclusion

For the reasons explained above, I recommend that the Motion for Contempt be denied.  Any objections to this Report and Recommendation must be specific and must be filed with the Clerk of Court within fourteen (14) days of its receipt.  <u>See</u> Fed. R. Civ. P. 72(b); DRI LR Cv 72(d).  Failure to file specific objections in a timely manner constitutes waiver of the right to review by the district court and of the right to appeal the district court's decision.  <u>See</u> <u>United States v. Valencia-Copete</u>, 792 F.2d 4, 6 (1st Cir. 1986); <u>Park Motor Mart, Inc. v. Ford Motor Co.</u>, 616 F.2d 603,

---

[14] The PI specifically states that any party may move for a modification warranted by the circumstances.  <u>See</u> PI at 7-8.

605 (1st Cir. 1980).


**/s/ David L. Martin**
DAVID L. MARTIN
United States Magistrate Judge
March 6, 2012